UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEWEENAW BAY INDIAN
COMMUNITY, on its own behalf and as
*parens patriea* for its members,

    Plaintiff,

v.

ROBERT NAFTALY, et al.,

    Defendants.
_____/

Case No. 2:03-cv-170

Honorable David W. McKeague

**OPINION**

    Plaintiff, the Keweenaw Bay Indian Community ("KBIC"), brings this action against Robert Naftaly, chairperson of the Michigan State Tax Commission, Robert Lupi, member of the Michigan State Tax Commission, Doug Roberts, member of the Michigan State Tax Commission, Dennis Platte, Executive Secretary of the Michigan State Tax Commission, L'Anse Township, Baraga Township, and Matthew Arko, Assessor of L'Anse and Baraga Townships.  Plaintiff seeks declaratory relief prohibiting the collection of the State of Michigan's *ad valorem* property tax on lands held in fee simple by KBIC or its members.[1]  Pending before this Court are defendants' and plaintiff's motions for summary judgment.  Having duly considered the parties' briefs, arguments and exhibits, for the reasons that follow, the Court will deny defendants' motion for summary judgment and grant plaintiff's motion for summary judgment.

---

[1] Plaintiff initially sought injunctive relief, but, as the Court previously noted in its Sept. 27, 2004 Opinion denying defendants' motion to dismiss, the parties reached a stipulation as to the issues involved in that motion and the Court need not address it further.

## I. FACTS

The Court has already set forth many of the facts applicable to the instant motion in its September 27, 2004 Opinion denying defendants' motion to dismiss and incorporates such facts by reference.[2] In addition, the Court notes that the following facts are relevant to the resolution of the pending motions for summary judgment.

KBIC is a federally-recognized Indian tribal government organized and operating under a Constitution and bylaws approved by the Secretary of the Interior on December 17, 1936, pursuant to the Indian Reorganization Act of 1934. 25 U.S.C. § 476. Pursuant to the Treaty with the Chippewa at La Pointe, Oct. 4, 1842, 7 Stat. 591 ("1842 Treaty"), the Chippewa of Lake Superior and the Mississippi ceded the western half of Michigan's Upper Peninsula as well as portions of northern Wisconsin to the United States.

Most of the Chippewa continued to live within the ceded area and Article II of the 1842 Treaty guaranteed them the right to hunt within the ceded territory until required to remove by the President. 1842 Treaty, 7 Stat. 591. By the late 1840's, due to United States surveys of the land in the area, the Chippewa became afraid that the President would force them to remove from their residences. In February 1850, President Zachary Taylor issued a removal order, but that order was later abandoned. The Chippewa sent letters to the President asking for the creation of permanent reservations and even adopted American-style names and clothing to convince the United States

---

[2] The Court notes that some of the facts pertinent to this case were also found by the court in *Keweenaw Bay Indian Community v. Michigan*, 784 F. Supp. 418 (W.D. Mich. 1991); an earlier case interpreting the 1854 Treaty. In *Keweenaw Bay*, the court addressed the extent of the Reservation boundaries and held that the boundaries of the reservation followed the exterior lines of townships and fractional townships described in the treaty and did not exclude lands that had been sold or otherwise disposed of by the government before the effective date of the treaty establishing the reservation.

2

government of their advanced state of civilization and thus the lack of any need for removal. According to one Indian agent at the time, removal was "the great terror of [the Indians'] lives and I hazard nothing in saying they will sooner submit to extermination than comply with it." *Keweenaw Bay*, 784 F. Supp. 418 (quoting Henry C. Gilbert). By 1854, the United States, under the leadership of Indian Commissioner George ManyPenny, abandoned the removal policy and substituted a policy of creating reservations for Indians near their existing habitations. Commissioner ManyPenny instructed United States officials to negotiate a new treaty with the Chippewa for the cession of land in Minnesota and Wisconsin.

A treaty was eventually signed on September 30, 1854. KBIC is the successor-in-interest of the L'Anse and Ontonagon bands of Chippewa Indians, signatories to the Treaty with the Chippewa at La Pointe, September 30, 1854, 10 Stat. 1109, ("1854 Treaty"). The Indians desired permanent homes in their present locations and the 1854 Treaty satisfied this desire by creating permanent homes for them on reservations. *See United States v. Thomas*, 151 U.S. 577, 582, 14 S. Ct. 426, 38 L. Ed. 276 (1894) (1854 Treaty created "permanent reservations" for the Chippewa). Article II of the 1854 Treaty also provided that 80 acres be patented to each mixed blood Chippewa over twenty-one years of age. 1854 Treaty, 10 Stat. 1109. All land, sold or unsold, within the exterior boundaries of the Reservation as described in Article II of the 1854 Treaty, formed part of the KBIC reservation and constituted Indian Country within the meaning of 18 U.S.C. § 1151. *Keweenaw Bay*, 784 F. Supp. 418, 428.

Two other articles of the 1854 Treaty are important to the resolution of the instant motions. First, Article III provides in part that:

> ... the President may, from time to time, at his discretion, cause the whole [reservation] to be surveyed, and may assign to each head of

3

> a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefore to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of a family, or single person occupying the same, or in case of its abandonment by them.

1854 Treaty, 10 Stat. 1109. Second, Article XI provides that:

> All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

*Id*. The Reservation Fee Lands at issue in this case consist of the sold lands that were at issue in *Keweenaw Bay*, 784 F. Supp. 418, 428, as well as lands that were allotted or intended for allotment to the Chippewa pursuant to Article III of the 1854 Treaty. The Reservation consists of 59,840 acres located near the villages of L'Anse and Baraga. 6,223 acres in the reservation are held in trust by the United States for the benefit of KBIC, 7,912 acres are allotments held by KBIC members with restrictions upon alienation, 2,987 acres are owned in fee simple by KBIC and 688 acres are owned in fee simple by KBIC members. Nonmembers of the Community own the remaining 42,030 acres within the Reservation. After the execution of the 1854 Treaty, pursuant to Article III of the 1854 Treaty, the President assigned parcels of Reservation land to individual Chippewa Indians. The assignments at issue in this matter were made in the form of fee simple patents. Additionally when restrictions upon alienation were removed from certain restricted patents, such removal was done pursuant to the 1854 Treaty.

Defendants argue that they are entitled to summary judgment because Congress explicitly

authorized the alienability of the land at issue in this case, and that the land is taxable under *Cass County, Minnesota, et al. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 118 S. Ct. 1904, 141 L. Ed. 2d 90 (1998). Plaintiff argues that Congress has *not* authorized the alienability of the land at issue here, and further, that the unambiguous language of Article XI of the 1854 Treaty states that the Indians shall not be required, under any circumstances, to remove from the reservation. Plaintiff also asserts it is entitled to summary judgment because the land is not taxable under the reasoning expressed in *Cass County*, or an extension thereof.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper if the non-moving party has failed to raise a genuine issue of material fact as to any element of the claim, and the moving party is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The facts must be construed most favorably to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must come forth with more than a "mere scintilla" of evidence to create a genuine issue of material fact. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505.

The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348. Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. 2505.

### B. The Community is Entitled to Summary Judgment on Counts I and II.

This case poses a legal question of whether the Supreme Court's decision in *Cass County,* 524 U.S. 103, 118 S. Ct. 1904, should be extended to cases involving alienation of land that occurred pursuant to a treaty and without any Congressional statute authorizing such alienation. It also raises questions of whether Congress passed such a statute, and whether language included in the 1854 Treaty precludes taxation of the land at issue in this case.

In Count I of its complaint, KBIC claims that defendants cannot enforce the Michigan General Property Tax Act ("Act") against the Reservation Fee Lands because states and local governments are precluded from imposing taxes upon Indian-owned lands within an Indian reservation absent an unmistakably clear authorization by Congress. In Count II of its complaint, KBIC claims that defendants cannot enforce the Act against the Reservation Fee Lands because such enforcement would violate the provisions of the 1854 Treaty, that set apart the Reservation as a permanent home for KBIC and its members. The Court will first address the parties' arguments related to Count II, which involves interpreting the 1854 Treaty, and will then address those arguments related to Count I.

### 1. Plaintiff is Entitled to Summary Judgement on Count II Because the 1854 Treaty Prohibits Involuntary Removal from the Reservation Lands.

Native American treaties must be liberally construed in favor of Native Americans. *State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676, 99 S. Ct. 3055, 61 L. Ed. 2d 823 (1979); *Antoine v. Washington*, 420 U.S. 194, 95 S. Ct. 944, 43 L.

Ed. 2d 129 (1975); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S. Ct. 672, 87 L. Ed. 877 (1943). The Treaty is governed by the intent of the parties, which consist of the Indian tribal signatories and the United States Government. *Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 206, 119 S. Ct. 1187.

Ambiguous words and phrases in Indian treaties have been resolved in favor of the Indians. *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S. Ct. 40, 42, 63 L. Ed. 138 (1918); *Winters v. United States*, 207 U.S. 564, 576-77, 28 S. Ct. 207, 211-12, 52 L. Ed. 340 (1908); *Jones v. Meehan*, 175 U.S. 1, 11, 20 S. Ct. 1 (1899) (stating that an Indian treaty "must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."). This rule is particularly applicable if the language of a treaty supports two inferences, one favoring the Indians and one the Government. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 350 (7th Cir. 1983) (citing *Winters*, 207 U.S. at 575-77, 28 S. Ct. 207) (stating that "it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the government, even if it could be supposed that they had the intelligence to foresee the 'double sense' which might some time be urged against them.").

The Supreme Court noted in *In re Kansas Indians,* 72 U.S. 737, 760 (1866), that "taxes must be first levied, and they cannot be realized without the power of sale and forfeiture, in case of non-payment." Where federal law precludes the sale of land for taxes, it also precludes the taxes themselves. *See In re New York Indians*, 72 U.S. 761 (1866) (striking down a New York statute that imposed property taxes on an Indian reservation but purported to preserve the Indians' continued right to occupy such lands). Generally, tax exemptions are not to be presumed, and statutes

7

conferring them are to be strictly construed, but the Supreme Court held that "the contrary is the rule to be applied to tax exemptions secured to the Indians between them and the national government." *Carpenter v. Shaw*, 280 U.S. 363, 366, 50 S. Ct. 121, 74 Led. 478 (1930).

The impetus for the 1854 Treaty was H.R. 293, 33d Cong., May 3, 1854, which contemplated that Chippewa heads of households would be granted eighty-acre parcels of land that would be exempt from taxation in return for cessions of Chippewa land in Minnesota and Wisconsin. The bill never made it out of committee, but a similar bill was passed in December of 1854. *See* Act of Dec. 19, 1854, 10 Stat. 598 (1854). The bill states:

> Fourth. The laws of the United States and the Territory of Minnesota shall be extended over the Chippewa territory in Minnesota whenever the same may be ceded, and the same shall cease to be "Indian country," except that the lands reserved to said Indians, or other property owned by them, shall be exempt from taxation and execution. . .

*Id.* Both parties argue that this bill, passed shortly after the 1854 Treaty was signed, supports their interpretation of the "removal" language in Article XI.[3]

The legislative history of the Act indicates that there was some contemplation that the Act would apply to land in Michigan. *See* Cong. Globe, 33d Cong., 1st Sess. 1334 (May 30, 1854). A provision in the Congressional Globe notes that Senator Sebastian, from the Committee on Indian affairs, addressed issues related to the Chippewa and states:

> He also, from the [Committee on Indian affairs], to whom was referred a petition of the Lutheran Synod of Missouri, Ohio, and other States, praying that a grant of land may be made to the head of every family of Chippewa Indians residing in Michigan, and an

---

[3] Indeed, the Supreme Court, in *Fee v. Brown*, 162 U.S. 602, 610, 16 S. Ct. 875, 40 L. Ed. 1086 (1896), stated, that although subsequent to the 1854 Treaty, the Treaty should be construed in light of the Act.

8

> appropriation for the support of schools among said Indians, asked to be discharged from its further consideration, on the ground that the prayer of the petition will be attained in the contemplated treaty with the Chippewa Indians; which was agreed to.

Cong. Globe, 33d Cong., 1st Sess. 1335. The Act, as it was enacted, mentions nothing about land in Michigan.

The Dec. 19, 1854 Act does not dictate the outcome of this case. While there is some mention of Michigan land in the legislative history, Congress could have explicitly mentioned the Reservation land at issue here in the statute but chose not to. Furthermore, contrary to defendants' suggestion, the fact that Congress included language prohibiting taxation on the land in Minnesota and not Michigan does not resolve the issues presented here in their favor.

Several treaties signed between other Indian tribes and the United States near the time of the 1854 Treaty contained language that exempted reservation lands from levy, sale or forfeiture until the state legislature removed the restrictions and Congress passed a statute consenting thereto. *See* Treaty with the Oto & Missouri*,* Mar. 15, 1854, Art. 6, 10 Stat. 1038; Treaty with the Omaha, Mar. 16, 1854, Art. 6, 10 Stat. 1043; Treaty with the Miami, June 5, 1854, Art. 2, 10 Stat. 1093; Treaty with the Umpqua & Kalapuya, Nov. 29, 1854, Art. 5, 10 Stat. 1125; Treaty with the Chippewa at Washington, Feb. 22, 1855, Art. 2, 10 Stat. 1165. The treaty at issue in *Goudy v. Meath*, 203 U.S. 146, 27 S. Ct. 48, 51 L. Ed. 130 (1906)), contained a clause that specifically contemplated the allotted land eventually becoming taxable. The treaty addressed in *Goudy* allowed the President to issue a patent for any allotted land, and stated that the land "shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the state shall remove the restrictions."   203 U.S. 146, 27 S. Ct. 48. In *Voigt,* 700 F.2d at 364, the Seventh Circuit

9

construed the same removal language as was included in the 1854 Treaty as creating a right not to be removed from land set apart for Indians except in cases of "misbehavior." Furthermore, in *Starr v. Long Jim*, 227 U.S. 613, 33 S. Ct. 358, 57 L. Ed. 670 (1913), the Court dealt with a treaty that included language that stated the Indians "shall not be required to remove to the Colville Reservation until Congress does make such an appropriation." While the parties to the 1854 Treaty could have included specific language in the treaty, stating that the Indians shall not be removed to a certain place, there is no such language in the 1854 Treaty. Similarly, there is no language in the 1854 Treaty at issue in this case that purports to make land taxable after the state legislature removes restrictions on levy sale and forfeiture.

Plaintiff argues that the removal language in Article XI of the 1854 Treaty applies to any removal whatsoever, and that the land is not taxable under *In re Kansas Indians,* 72 U.S. 737 and *In re New York Indians*, 72 U.S. 761. Defendants argue that the words "Indians" and "homes," as used in Article XI indicate the "communal nature of the right [not to be removed from the reservation lands.]" Def's Br. In Opp'n to Pl's Mot. Summ. J. at 12. The words "set apart" refer to Article I where the United States agreed to create the L'Anse reservation. *Id*. According to defendants, these words combined, mean that the United States will not force the Community to leave the reservation because of the removal order issued in 1850. *See* Dr. Anthony Gulig, *A history of the Chippewa Treaty of 1854 with Special Reference to the Chippewas' Understanding of the Treaty, the Creation of Reservations, and Allotment Provision of the Treaty*, 24 & 44 (2004).[4]

---

[4] Defendants also rely on a report by Dr. Emily Greenwald, in support of their motion for summary judgment. *See* Dr. Emily Grreenwald*, The Administration of Indian Allotments at L'Anse*, 9-19 (2004). The only conclusion that Dr. Greenwald reaches that arguably lends support to their claims is that "[b]y 1919, if not earlier, Indians at L'Anse understood that their lands became taxable when restrictions were removed." However, this conclusion does not

Defendants argue that Dr. Charles Cleland's report (Plaintiff's expert) and congressional legislation passed after the 1854 Treaty was signed establishes that the removal language in the 1854 Treaty only applied to a forced removal to Minnesota. During the 1840's and 1850's the Chippewa were afraid of such removal. Dr. Charles E. Cleland, *A Treaty History Relating to Land Ownership and Taxation on the Keweenaw Bay Indian Reservation*, Sept. 27, 2004, 42, 63. (Pl's Ex. 2.) According to Dr. Cleland, "Article [XI] solemnly guarantees that the signatory band would never be required involuntary to leave or give up their reservations created by the treaty for any reason." Cleland Report at 69. There is no record that anyone attempted to explain taxation to the Indians or that they thought they would have to pay money each year to keep their homes. *Id.* at 104. Dr. Cleland further notes that the process of assessing tax liens on the reservation lands would be "fundamentally contrary to the purpose of the treaty, that is, to provide secure and permanent homes for the Ojibwe bands." *Id.* at 70.

The 1854 Treaty does not mention property taxes at all. Dr. Cleland notes that the Chippewa, in signing the 1854 Treaty, understood that they had acquired permanent reservations and "would not be forced to leave the reservations." Cleland report at 75 (citing Nichols, John. D. 1988 *Statement made by the Indians: A Bilingual Petition of the Chippewa of Lake Superior, 1864*. London: Ontario Center for Research and Teaching of Canadian Native Languages). Dr. Cleland further notes that the concept of taxation was foreign to the Indians and that if they had understood

---

enlighten the Court as to what the Indians may have believed at the time the Treaty was signed, and therefore, the Court assigns little weight to the conclusions reached in Dr. Greenwald's report.

11

that they had to pay money each year in order to keep their homes, they would not have signed the treaty. *Id* at 108, 112.[5]

Whether interpreting the removal language based on its plain meaning or a liberal understanding of what the Indian signatories would have believed it meant in the 1850's, the result is the same. The "removal" language of Article XI is, at the very least, ambiguous as to its scope. The 1854 Treaty does not qualify, limit or condition the right against removal in any way. Even if the most pronounced fear of the Indians at the time of signing the 1854 Treaty was forced removal to Minnesota it also appears that the Indians contemplated the establishment of a permanent reservation. The removal language in the 1854 Treaty supports at least two inferences, one favoring the Indians, and one favoring the government. Following the established rules of Indian treaty interpretation, the Court cannot say that the Indian signatories to the 1854 Treaty would have contemplated the future sale of their lands due to non-payment of taxes. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200; *Winters*, 207 U.S. at 575-77.

---

[5] Defendants' expert, Dr. Anthony G. Gulig, also prepared a report with reference to the 1854 Treaty. Dr. Anthony G. Gulig, *A History of the Chippewa Treaty of 1854 with Special Reference to the Chippewas' Understanding of the Treaty, the Creation of Reservations, and Allotment Provisions of the Treaty*, Dec. 5, 2004. Dr. Gulig reaches the conclusion that the Indians knew the "economic value and liability" of the reservation land and individual land they acquired through the 1854 Treaty. *Id.* Dr. Gulig also asserts that there was no need for special exemption from taxation in the 1854 Treaty because the Indians wanted to participate as citizens of the state and taxation was "an important part of that citizen participation."

While Dr. Gulig's conclusions conflicts with the conclusions of Dr. Cleland in some respects, the Court notes that Dr. Gulig's report focuses more on what was *not* in the 1854 Treaty than on the meaning of the "removal" language. The Court will not presume that the Indian signatories desired to subject themselves to the potential loss of their land through a tax sale simply because it was an "important part" of citizen participation, when all other indications point to the opposite conclusion.

Defendants' interpretation of the 1854 Treaty is too narrow. It defies logic to believe that the Indians would have signed a treaty ceding over seven million acres to the United States, knowing that they could lose the land they kept as a reservation the following year, due to non-payment of taxes. Furthermore, under defendants' interpretation of the Treaty, each individual land owner could be dispossessed of his or her land without violating Article XI, as long as the entire community was not removed all at once. A liberal reading of the removal language in the 1854 Treaty, and giving the Indians the benefit of the assumption that they were not alert to exclude every inference which might defeat the declared purpose of the 1854 Treaty, *Winters v. United States*, 207 U.S. 564, leads the Court to the conclusion that the removal language must be construed more broadly than to prevent removal to Minnesota. Therefore, because the Court finds that the removal language in the 1854 Treaty includes removal due to a tax sale for non-payment of *ad valorem* property taxes, the land at issue here is not subject to the Act and plaintiff is entitled to summary judgment on Count II.

**2. Plaintiff is Entitled to Summary Judgement on Count I Because Congress has not Manifested an Unmistakably Clear Intent to Render Such Land Subject to State Taxation.**

Even assuming, *arguendo*, that the removal language in the 1854 Treaty should not be interpreted as plaintiff believes it should be, plaintiff is still entitled to summary judgment on Count I. Indian reservation land is generally exempt from state and local taxation absent cession of jurisdiction or other federal statute permitting it. *Cass County,* 524 U.S. 103, 110, 118 S. Ct. 1904; *see e.g.*, *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 254, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992) (holding that the General Allotment Act ("GAA") permitted Yakima County to impose *ad valorem* taxes on reservation land patented in fee

13

under the GAA).  In *Cass County*, the Supreme Court held that "when Congress makes reservation lands freely alienable, it is unmistakably clear that Congress intends that land to be taxable by state and local governments, unless a contrary intent is clearly manifested."  *Cass County*, 524 U.S. at 113, 118 S. Ct. 1904 (the Nelson Act of 1889, 25 Stat. 642 (1889)); *Yakima*, 502 U.S. at 268, 112 S. Ct. 683 (the GAA of 1887, 24 Stat. 388 (1887)); *Goudy v. Meath*, 203 U.S. 146, 147, 27 S. Ct. 48, 51 L. Ed. 130 (1906) (Act of Mar. 3, 1893, ch. 209, 27 Stat. 612, 633 (1893)).  None of the aforementioned Supreme Court decisions expressly apply to Indian reservation lands made alienable pursuant to a treaty, which is not an act of Congress, but rather, a contract between sovereign nations. *See Washington State Commercial Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 675, 99 S. Ct. 3055.

There is no dispute in this case that the land at issue here is in fact alienable.[6]  There is a question, however, of whether Congress authorized, made or rendered such lands freely alienable. Defendants argue that Congress made the land alienable, and therefore taxable, under *Cass County*, when it stated:

> [t]hat wherever, in any law or treaty or in any patent issued to Indian allottees for land in severalty pursuant to such law or treaty, there appears a provision to the effect that the lands so allotted can not be alienated without the consent of the President of the United States, the Secretary of the Interior shall have full power and authority to consent to or approve of the alienation of such allotments.

Act of Sept. 21, 1922, 42 Stat. 991, 995 ("1922 Statute").  Defendants argue, when it passed the 1922 Statute, Congress intended that there would be no question regarding titles for land properly allotted and alienated under the 1854 Treaty in the past or future and that the 1922 Statute shows the

---

[6] Plaintiff conceded this point at oral argument on January 31, 2005.

necessary congressional intent to make the land at issue here alienable and therefore taxable. *See* H.R. Rep. No. 67-637 at 11 (1922); S. Rep. 67-551 at 8-9.

While Congress can make Indian reservation land freely alienable, and therefore taxable under *Cass County*, it does not appear that Congress has done so with regard to the land at issue in this case. In both *Cass County* and *Yakima*, Congress made Indian Reservation land freely alienable by specifically addressing the reservation land at issue in each case. In *Cass County*, the Court noted that Congress addressed the alienability of reservation land at issue in sections five and six of the *Nelson Act* when it removed the land from federal protection. 524 U.S. 103, 118 S. Ct. 1904; Nelson Act of 1889, 25 Stat. 642. In *Yakima*, the Court noted that the GAA and the Burke Act Proviso clearly manifested Congressional intent to allow taxation on the Yakima reservation lands because it expressly addressed the taxability of fee-patented land. 502 U.S. 251, 112 S. Ct. 683; General Allotment Act, 24 Stat. 388; Burke Act Proviso, 34 Stat. 182, 25 U.S.C. § 349 (1906).

The 1922 Statute does not remove land from federal protection, make land alienable, allot Indian reservation land or address the taxability of any such lands. Instead, as plaintiff argues, the statute appears to be more of an "administrative housekeeping measure," than an act that was intended to abrogate or change rights under the 1854 Treaty or address the alienability of such land. The legislative history of the 1922 Statute confirms this point. See H.R. Rep. No. 67-637, at 11 (1922); S. Rep. No. 67-551, at 8-9 (noting that the bill serves to clarify title issues and confirm that the Secretary of the Interior had the authority to act for the President in these matters). A letter from the Secretary of the Interior, included in the legislative reports explains:

> It has been suggested, however, that abstracters and possibly others concerned in seeing that indefeasible titles are obtained prefer something more definite to which they can point as specific evidence of the authority now believed to exist in the Secretary of the Interior

15

> to remove the restrictions in those cases where the original law or treaty under which the allotments were made direct that alienation can not be had without the consent of the President.

*Id.* at 12; *Id.* at 9-10. Furthermore, a later opinion of the Solicitor General described the 1922 Statute as a clarification of the Secretary of the Interior's existing powers rather than a new grant of authority:

> [T]he act of September 21, 1922 (42 Stat. 994, 995, 25 U.S.C. sec. 392), expressly authorized the Secretary of the Interior to permit the alienation of allotments which under any law or treaty could be alienated only with the consent of the President. But at least in this particular instance the legislative history establishes conclusively that the purpose of the statute was merely to allay the traditional anxiety of conveyancers.

58 Interior Dec. 499, 513 n. 25, 1943 WL 4350, (Pl's Ex. 11).

The 1922 Statute addressed the alienability of land to the extent that it addressed the authority of the Secretary of the Interior to act on behalf of the President. However, the words used in the statute have nothing to do with the alienability of the reservation land at issue in this case. Therefore, because defendants have not and it appears cannot show that there is a Congressional act that made the land at issue here freely alienable, the Court finds that the land is not taxable under *Cass County*.[7]

Defendants further state that the 1854 Treaty became the supreme law of the land after the Senate advised and consented to the 1854 Treaty, *Foster v. Neilson*, 27 U.S. 253, 314-15 (1829), and

---

[7] The Court is well aware that Congress has the power to address the alienability of the land at issue in this case. If Congress had addressed the alienability of the Reservation lands at issue here, but not the taxability, the principle announced by the Supreme Court in *Cass County* would "fill in the blanks," so to speak, and dictate that the land be taxable (unless Congress manifests a clear intention to the contrary). Such is not the case here.

that ratification of the 1854 Treaty showed the necessary "congressional" intent to make the lands alienable and therefore taxable.[8] Defendants assert that the ratification of the 1854 Treaty essentially amounted to an act of the legislature and manifested the requisite Congressional intent to make the land alienable and therefore taxable. The Supreme Court someday may hold that ratification of a treaty is equivalent to an Act of Congress, and that land allotted and alienated pursuant to a treaty, as opposed to an act of Congress is taxable. However, the Supreme Court has not embraced this proposition at this time. Anticipating the direction in which the Supreme Court will direct the law may indeed be an exciting proposition, but it is not the proper role for this Court. The Court, therefore, rejects defendants' argument that the principles announced in *Cass County* should be extended to this case, where there is no congressional act addressing the alienability of land allotted under the 1854 Treaty. The two legal questions presented by Count I are properly resolved in plaintiff's favor and lead the Court to the conclusion that the land at issue here is not taxable. Therefore, the Court finds that there are no genuine issues of material fact and will grant summary judgment in plaintiff's favor on Count I as well.

---

[8] Defendants argue that the Second Circuit's opinion in *Thompson v. County of Franklin*, 314 F.3d 79 (2d Cir. 2002), supports their position that land allotted under a treaty which became freely alienable is subject to state *ad valorem* taxation. Because the Court declines to extend *Cass County* to facts of this case, the Court finds the reasoning expressed in *Thompson*, a case without a majority opinion, unpersuasive.

### III. CONCLUSION

Applying the rules of Indian Treaty interpretation, following Supreme Court precedent as it stands today, and noting that the questions involved here essentially involve legal determinations, the Court finds that there are no genuine issues of material fact in this case, and plaintiff is entitled to Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 56.

An order consistent with this opinion shall issue forthwith.


Dated: May 27, 2005                                     /s/   David W. McKeague
                                                        DAVID W. McKEAGUE
                                                        UNITED STATES DISTRICT JUDGE